UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

CONNIE S. HEPBURN,                    )
     Plaintiff,                        )
                          )
v.                                    )          NO. 2:11-CV-207
                          )
SUN LIFE ASSURANCE COMPANY            )
OF CANADA; SUN LIFE AND               )
HEALTH INSURANCE COMPANY              )
(U.S.), f/k/a GENWORTH LIFE AND       )
HEALTH INSURANCE COMPANY,             )
     Defendants.                       )

## MEMORANDUM OPINION AND ORDER

This ERISA[1]   matter is before the Court to address the motion for judgment on the

administrative record filed by the plaintiff, Connie S. Hepburn, [Doc. 24], and the motion for

summary judgment filed by the defendants, Sun Life Assurance Company of Canada[2] and Sun Life

and Health Insurance Company (U.S.), f/k/a Genworth Life and Health Insurance Company,

(collectively "Sun Life"), [Doc. 21]. Effective October 20, 2009, Sun Life terminated the plaintiff's

long term disability benefits claiming  that  Ms. Hepburn's medical conditions "had clearly been

addressed" and she was "capable of sedentary work."   The parties have filed responses and replies

in regard to the motions, [Docs. 29, 30, 31, 32], and this matter is now ripe for disposition.

### I.      Standard of Review

This case concerns the determination of benefits under a plan governed by ERISA. The

_____

[1]  Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq.

[2]  Nothing in the record establishes that Sun Life Assurance of Canada issued or administered the policy at
issue in this case or is otherwise a proper party defendant.

Supreme Court and the Sixth Circuit have held that a district court should review a plan administrator's determination of benefits under an ERISA plan *de novo* unless the plan expressly gives the administrator discretionary authority to determine eligibility for benefits or to construe the plan's terms, in which case it should employ the deferential arbitrary and capricious standard. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111–12(1989); *see also Killian v. Healthsource Provident Adm'rs, Inc.,* 152 F.3d 514, 520 (6th Cir.1998). The "arbitrary and capricious" standard applies in this case because the policy gives the administrator discretionary authority by requiring employees to provide Sun Life with "satisfactory" proof of disability to receive benefits. *Cf. Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 380–81 (6th Cir.1996).

Under the deferential "arbitrary or capricious" standard this Court will uphold a benefit determination if it is "rational in light of the plan's provisions." *Yeager*, 88 F.3d at 381. In other words, "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir.1989). However, merely because the arbitrary and capricious standard "'must be deferential does not mean our review must also be inconsequential . . . . [T]he federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions.'" *Evans v. Unum Provident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006)(quoting *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005)). The degree of difference due the administrator's decision, however, was underscored recently by the Sixth Circuit in *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059 (6th Cir. 2014), where the Sixth Circuit held that, although "the standard is not without some teeth, it is not all teeth," and an "'extremely

2

deferential review,' to be true to its purpose, must actually honor an 'extreme' level of 'deference' to the administrative decision." *Id.* at 1064-65.

The review of a decision to terminate benefits calls for a totality of the circumstances type of analysis. The Court must take account of several different considerations" and any one factor's significance "depend[s] upon the tiebreaking factor's inherent or case-specific importance." *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 117 (2008). If the plaintiff was originally found disabled, the plaintiff is entitled to continue receiving benefits until Sun Life offers a "deliberate, principled" reasoned decision for terminating those benefits. *Rochow v. Life Ins. Co. of North America*, 737 F.3d 415, 418, (6th Cir. 2013); *Neaton v. Hartford Life and Acc. Ins. Co.*, 517 Fed.Appx. 475, 487 (6th Cir. 2013)(unpublished disposition). However, "it is the employee who must continue to supply on demand proof of continuing disability to the satisfaction of the insurance company.*" Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 985 -986 (6th Cir. 1991).

One of the factors to be considered is the conflict of interest that results when the plan administrator not only pays benefits to employees, but also determines who is eligible to receive benefits. *Glenn v. Metlife,* 461 F.3d 660, 666 (6th Cir. 2006). Additionally, the Court must "review the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Id.* In addition, the Court is entitled to "factor in the plan administrator's failure to give consideration to the Social Security Administration's ("SSA") determination that [a claimant] was totally disabled." *Id.*

## II.    Procedural and Factual Background

Plaintiff began her employment with Toyoda-Koki Automotive North America, Inc. ("Toyoda") on February 13, 1992. By virtue of her employment, she became a "participant," within

3

the meaning of ERISA §3(7), 29 U.S.C. § 1002(7), in an employee welfare benefit plan (the "plan")

providing long term disability insurance ("LTD") through a policy issued by Sun Life to the Trustee

of the Manufacturing Industry Group Insurance Fund, with Toyoda designated as the

Employer/Trust Participant. Toyoda delegated claims administration responsibilities to Sun Life.

Under the policy, an insured must meet four requirements to receive monthly disability benefits:

> We will pay you the Monthly Benefit shown in the INSURANCE SCHEDULE for a Period of Disability, subject to all of the terms of the policy, if you satisfy all of the following conditions:
>
> 1. You must send Proof to us that you have become disabled;
> 2. You must be insured under the policy at the time your Disability commences;
> 3. You must be under the regular and Continuing Care of a Physician for the Sickness or Injury causing your Disability; and
> 4. You must have completed the Elimination Period shown in the INSURANCE SCHEDULE.

[Doc. 1-1 at 21]. The policy contains a number of other provisions relevant to this dispute:

> "Total Disability" and "Totally Disabled" are defined as:
>
> Total Disability must be caused by Sickness or Injury and must commence while you are insured under the policy. You will be considered Totally Disabled if:
>
> 1. During the Elimination Period and the following 60 months, you are unable to perform all the material and substantial duties of your Regular Occupation.
> 2. After the Elimination Period and the following 60 months, you are unable to perform the duties of Any Occupation.

[*Id*. at 16].

"Regular Occupation" is "[t]he occupation you are performing when your Period of

Disability commences. This refers to your occupation as it is typically performed rather than the

duties required by a specific employer or at a specific location." [*Id*. at 14]. "Any Occupation" is defined as "[a]ny gainful occupation that you are qualified for or may reasonably become qualified for by education, training or experience. Your level of earnings from your prior occupation will be considered in determining any occupation ." [*Id*. at 6]. "If a Period of Disability is caused by, contributed to by, or results from Mental Illness, the Monthly Benefit will be paid for not more than a total of 24 months during a Period of Disability." [*Id*. at 3].

"The term 'Mental Illness':

> 1. Means any Sickness, disease or disorder, including those which are the result in any way of a genetic, chemical, organic or biologic cause, which:
>> a) is medically classified or considered, whether in whole or in part, to be a psychological, behavioral or emotional condition; or
>> b) is manifested by psychological distress or impaired social functioning, or both; or
>> c) is treated by or dealt with, in whole or in part, through psychotherapeutic or sociotherapeutic methods or by medication which is intended to alter or effect emotions, behavior or thought content.
>
> 2. Includes but is not limited to:
>
>> a) anxiety, panic, and somatoform disorders;
>> b) mood disorders, including depression and bipolar disorder (manic depression);
>>> . . .
>> e) any Sickness, disease or disorder which a reasonable person would commonly consider to be a mental or emotional disease or disorder.
>
> This listing is intended to present examples of Mental Illness and shall not be taken or construed as a limitation of the term as it is defined above."

[*Id*. at 10-11].

On May 4, 2004, Hepburn was diagnosed with cancer of the pituitary gland. At the time, she was five months pregnant. Hepburn continued to work until May 24, 2004. She had surgery on May 27, 2004, and, after giving birth, Hepburn began extensive radiation treatments. On August 25, 2004, she submitted an application for LTD under the policy. The application listed her diagnosis as a complicated pregnancy with a pituitary tumor. The claim for benefits was initially approved on September 27, 2004. The LTD benefits were periodically continued and the claim was continuously approved through October 19, 2009.

On April 24, 2009, Sun Life placed the claim into review and notified Hepburn that the 60-month period for receipt of benefits for disability from her regular occupation would end on October 19, 2009 and her claim was being reviewed to determine if she remained disabled from performing *any* occupation and thus eligible to receive disability benefits beyond the first 60-month period.[3] Sun Life asked for certain information, including a completed questionnaire from her attending physician, and an authorization for release of information, including her medical records.

Dr. Bill Ramsey, Hepburn's treating physician, returned the completed questionnaire on May 15, 2009. Her current diagnosis was "pituitary adenoma; hypothyroidism; depression" with subjective symptoms of "fatigue." Dr. Ramsey noted that Hepburn's last visit was "10/10/2008." Dr. Ramsey opined that Hepburn had reached her maximum medical improvement and would "likely never" recover sufficiently to return to work. He noted functional limitations as occasionally able to lift or carry up to 20 pounds and never able to lift or carry over 20 pounds. Dr. Ramsey listed as "unknown" any limitations on standing, kneeling, finger dexterity, total time on feet, standing,

---

[3] Contrary to plaintiff's assertion, it does not appear that Sun Life took over the claim from Genworth and then placed "an unusually intense focus" on the standard of disability from performing any occupation. As set forth in the policy, that was the only focus after the first 60 months of disability. In addition, the uncontroverted evidence is that Genworth had simply changed its legal name to the current name of Sun Life and Health Insurance Company.

6

walking, bending, squatting or stooping.  Dr. Ramsey listed work restrictions with respect to an 8-hour work day, a 5-day work week and under "limited stressful circumstances."  He further noted "psychiatric impairment" in that Hepburn could "engage in only limited stress situations and engage only in limited interpersonal relations."

Dr. Ramsey's 2010 treatment records contain diagnoses of depression, fibromyalgia, hypothyroidism, interstitial cystitis and abdominal discomfort.  Dr. Ramsey's notes indicate that Hepburn was suffering from "fatigue and malaise" or excessive fatigue and/or muscle weakness, anxiety and depression.  Dr. Ramsey's notes list a number of prescription medications being taken by Hepburn, including Lunesta, Simvastatin, Miralaz, Lexapro, Levoxyl, Estradiol, and Trazodone.  In an October 29, 2009 office note, Dr. Ramsey noted that Hepburn was "chronically fatigued" and could not "hold down any sort of work position."  Dr. Ramsey diagnosed Hepburn with chronic pituitary disorder, controlled hyperlipidemia, chronic fatigue and malaise, and chronic interstitial cystitis.  He specifically opined that she was unable "to hold down any sort of job" and he "disagreed with the opinion of the doctor for Sun Life" (Dr. Furhmann) concerning Hepburn's sedentary work abilities.

On June 11, 2010, Dr. Ramsey wrote a "To Whom It May Concern" letter concerning his opinions in Hepburn's case.  He wrote:

> . . .
>
> She has multiple chronic health issues that affect her ability to maintain regular employment. She had a pituitary adenoma (a brain tumor) irradiated several years ago which affected her ability to problem solve, and think clearly. She has resulting hypothyroidism secondary to this, fibromyalgia, interstitial cystitis, major depression, and a recent diagnosis of Guillan-Barre syndrome (a post viral illness that causes varying degrees of weakness in the musculature of the

> arms and legs – and it can also lead to respiratory depression). She
> has significant daily fatigue.
>
> Ms. Hepburn is significantly disabled by all of these conditions and
> I don't feel she will be in any condition to achieve gainful
> employment in the future. I would whole heartedly support her
> disability benefits.

Dr. Kyle Colvett, M.D., a board certified oncologist oversaw Hepburn's radiation treatments following her cancer surgery. Multiple reports prepared by Dr. Colvett are part of the record. Among other things, Dr. Colvett states that Hepburn underwent a "transsphenoidal resection of a very bulky tumor" followed by "postoperative adjuvant radiation therapy because of the gross residual suprasellar disease in close proximity to the optic nerve and chiasm." Follow up treatment notes document that Hepburn suffered from fatigue, bladder pain and urgency, sleep disturbances, and myalgias. On October 26, 2006, Dr. Colvett believed that many of the conditions were endocrine-related.

Dr. Colvett's reports note that Hepburn was experiencing post-surgical and post-radiation memory and concentration problems as well as extreme fatigue. Dr. Colvett noted, "we expect patient with her story to develop panhypopituitarism, a medical term growth hormone deficiency." Dr. Colvett wrote, "it is the expected outcome after transssphenoidal surgery and postoperative radiation therapy" that she would have very little native production of pituitary hormones and that whatever production she has would diminish over time." Dr. Colvett's earlier notes state that Hepburn was experiencing "severe depression, feelings of hopelessness, worthlessness, and even some primitive suicidal ideation."

Dr. Colvett's December 2009 report notes that Ms. Hepburn had been suffering from several complications, and she might be experiencing growth hormone deficiency.

. . . Ms. Hepburn has really been feeling unwell. Her mood disorder has become debilitating for her. She spends a significant amount of her time in bed. She is tearful. Numerous medications have not been beneficial in changing her pattern of symptoms. She has been more and more suicidal. She feels bad, depressed, and has myalgias. She is being treated for interstitial cystitis. She has had bowel problems.

On May 10, 2010, Dr. Colvett wrote, in a letter addressed to plaintiff and submitted to Sun Life:

. . . You were found to have pituitary macroadenoma while you were pregnant in 2004. This was a very bulky tumor and a transsphenoidal resection was accomplished after delivery of your baby. We delivered postoperative radiation therapy because there was significant tumor remaining that was in close proximity to your optic nerve and optic chiasm. We finished the radiation treatment in early 2005 and I am pleased that our imaging studies have shown good control.

I know that your health has been very poor now for several years... [Y]ou have traveled to visit with clinicians at the Mayo Clinic, in Minnesota, at Boston Massachusetts General Hospital and Harvard Medical School in Boston and at the Duke University Medical Center in Durham, North Carolina. I know that you have met with neurologists, endocrinologists, psychiatrists, ENT surgeons, and rheumatologists. It is my impression that your condition is chronic and severe and you are unable to pursue any meaningful work. Your fatigue, your inability to concentrate, your memory changes, and your mood problems are all significant and require careful and ongoing medical treatment.

[I]t is my clinical judgment, having known you for a number of years, that you are unable to pursue any meaningful work and that you are completely and totally disabled.

In early 2010, plaintiff was referred by Dr. Ramsey to T. Darrell Thomas, M.D., a Knoxville neurologist. Hepburn was continuing to have pain and muscle weakness which had not responded to treatment. On March 25, 2010, Dr. Thomas assessed Hepburn and provided a diagnosis of probable "early Guillain-Barre' syndrome" based on her symptoms of fatigue, neuropathies, numbness, and leg cramps. Dr. Thomas noted that Hepburn had some "dysethesesias," which are

9

abnormal feelings or sensations of the central nervous system. On April 20, 2010, Plaintiff underwent a MRI of the brain which found:

> . . . There is a from [sic] an ovoid focus of nonenhancing material present within the gland along its anterior inferior margin which could represent residual recurrent neoplasm or may represent surgical change.

On that same date, Hepburn was found to have "mild early degenerative disc changes with uncovertebral spurring" and some moderate "foramina narrowing on the left at C4-5, C5-6." Dr. Thomas treated Hepburn using typical modalities and noted, on May 28, 2010, that he felt her Guillain-Barre' was "improving." He noted, however, her continued "dysesthesias." In April 2010, Dr. Thomas had reassessed Hepburn's condition and noted that she had "Guillain-Barre' with slightly worsening of her gait," which he described as "somewhat clumsy and more ataxic." On May 28, 2010, Dr. Thomas wrote the following "To Whom It May Concern" statement of restrictions and limitations:

> Mrs. Hepburn is currently a patient of mine with Guillain-Barre'. Her current symptoms include dysesthesias as well as some generalized weakness. Her current restrictions include no lifting, climbing, bending, or balancing.

On July 28, 2010, Dr. Thomas's record indicates that Ms. Hepburn continued to suffer with fatigue and muscular "numbness and tingling." He noted that, in the past, Hepburn regularly "walked 2 miles per day and now can barely walk one block and finds this very frustrating." He prescribed physical therapy.

In 2007, Hepburn was referred by Dr. Ramsey to Dr. Katherine Cameron, M.D., a board certified urologist, for problems with her bladder "that had developed in 2006." Hepburn had "bladder spasms," "constant bladder pain and pressure," and a significant amount of pain. Dr.

Cameron noted in her review of systems that Hepburn "is positive for ringing in her ears, palpitations, musculoskeletal pain, stiffness, swelling, and weakness consistent with fibromyalgia, constipation, memory loss, depression, anxiety, concentration difficulties, insomnia and poor sleep, hormonal problems, heat and cold intolerance, dry skin, ongoing tiredness, and change in hair and nails."  Dr. Cameron began by performing  hyperdistension of the bladder, which did not correct the problem.

Then, Dr. Cameron attempted Heparin treatments to address the persistent bladder pain.  Dr. Cameron also prescribed a course of bladder flushing treatments. Hepburn was taught self-administration, and was "able to place the Rimso in the bladder without difficultly. Unfortunately, while removing the catheter the majority of the treatment spilled onto the floor." The records revealed that the Rimso bladder flushing treatments would occasionally provide relief and improvement, and then, faced with stress, Hepburn's condition would flare up.

On May 5, 2010,  Hepburn's interstitial cystitis was noted as causing "excruciating pain." After having had a "near resolution of her symptoms," the records reveal the same symptoms had returned "with a vengeance."  The records demonstrate that Hepburn was scheduled regular bladder flushing treatments "every two weeks" for her condition, which was noted as "painful" and "burning."  Hepburn subjected herself to this catheterized flushing at least 15 times in 2009 and nearly as many in the first half of 2010 with increasing frequency.   In May 2010, Dr. Cameron wrote that:

> This letter is regarding Ms. Connie Hepburn, who has interstitial cystitis. We have tried many things on her and currently she is on every-two-week DMSO bladder washings to help control her pain. Her constellation of bladder symptoms mainly includes bladder spasms and pain. Previously she has undergone heparin treatments in her bladder. She has also undergone cystoscopy with hydrodistention,

10

which initially helped, but the repeat one did not. She has not gotten significant benefit with urinary analgesics. She requires an IC diet which can be quite limiting and has been good about this.

Since 2008, Dr. Kenneth Jobson, M.D. has treated Hepburn and prescribed medications for depression and anxiety. Dr. Jobson's records note that Hepburn has clinical depression and had been prescribed Lexapro, Trazadone, and Lunesta. In June 2010, Dr. Jobson wrote:

> I am the treating psychiatrist for Mrs. Hepburn and have been since 2008. She has recurrent severe major affective disorder in addition to a history of partial removal of a pituitary macroadenoma of the brain and radiation to the brain. She has multiple endocrine problems from radiation including hypothyroidism and gonadal failure. She also has interstitial cystitis and Guillain-Barre' along with fibromyalgia and chronic fatigue. She has a decrease in concentration, decrease in recent and working memory, and severe stress intolerance. Her psychiatric medications are Lexapro, Trazadone, and Lunesta.
>
> Mrs. Hepburn is cooperative in her care and is motivated but is unable to work. This lady is totally and permanently disabled.

Elizabeth McColl, a psychotherapist, saw Hepburn regularly throughout 2008-09. Her record notes that Hepburn is suffering from "depression" and/or "medical pain". The records note that the "bladder treatments and issues" were causing her pain and that she suffered from fatigue. Other entries note Hepburn's "suicidal ideation." At one point, the therapist notes that Hepburn stated that "I need to feel there is a reason for life." McCall noted symptoms of anxiety, appetite problems, boundaries, depression, devaluing, disillusioned, exhausted, guilt, loss, self-esteem, sleep disturbance, stress and worry.

Dr. Shirin S. Shahbazi, M.D., Hepburn's gynecologist, notes Hepburn's complex medical condition, endocrine deficiencies, and other hormonal abnormalities. On April 23, 2009, Hepburn was, according to Dr. Shahbazi, at risk for ovarian cancer, and she underwent a hysterectomy. In

11

May, 2010, Dr. Shahbazi noted that Hepburn was "walking with assistance with a cane" and "very slow and unsteadily on her feet." This represented a medical difference neurologically "from when she was last seen" by Dr. Shahbazi in October, 2009. Dr. Shahbazi "defer[red] her limitations and restrictions to her other doctors."

Hepburn provided Sun Life her records from several major medical centers, Duke University, Vanderbilt University, the Mayo Clinic and Massachusetts General. On December 28, 2009, Dr. Colvett referred plaintiff to Dr. Warner Burch, Professor of Medicine, Duke University Medical Center, for evaluation. Dr. Colvett noted that Hepburn's "condition is complex" and she suffered from "a constellation of symptoms and health problems over the years which have defied diagnosis." He noted that her health problems have included "mood disorder, profound fatigue, and myalgias." Dr. Bunch saw Hepburn on February 2, 2010. As a result of thyroid studies, he recommended "hormone supplementation in regard to estrogen and Levotnyroxine" but not cortisone supplementation. "As far as treatment," Dr. Bunch opined, Hepburn needed to "continue the same medications."

Hepburn was seen at the Mayo Clinic in December, 2006, by referral from Dr. Ramsey. At the Mayo Clinic, doctors confirmed a number of Hepburn's medical disorders including memory loss, concentration issues, myalgias and arthralgias , bladder spasm, and anxiety disorder. Plaintiff was seen by a number of doctors at Mayo, including an endocrinologist, an otorhinolaryngologist, and a psychiatrist. Hepburn's pituitary functional status was described as "quite good" and the pituitary imaging showed "nothing threatening at the moment." A residual tumor was observed "sitting on the left rella area" which was not getting any larger. It was noted that it might be a "couple of years before she will know the full benefit from the radiation therapy." Overall, things

looked "fairly good."  On December 19, 2006, Dr. Paul Charles Carpenter of the Mayo Clinic also reported:

> On top of that also had some problems in concentration and other cognitive types of problem.  She was seen by a neurologist and they did not make a diagnosis of any organic issues but felt this was probably representing depression.

In 2006, doctors at Vanderbilt University Hospital found a growth hormone deficiency but noted that the FDA would not approve treatment with growth hormone in patients who have active malignancies.   In March 2009, endocrine testing was done at the Neuroendocrine Clinic at Massachusetts General Hospital.  The results were "essentially normal" except for a lower IGF-1 level."   Other tests were normal or negative.  It was characterized as "good news" that no abnormalities were found; however, no good explanation could be found for plaintiff's fatigue.

After gathering Ms. Hepburn's extensive medical records[4], a Sun Life nurse wrote a lengthy "Summary of Data."  on August 29, 2009.  The summary appears at pages 14-18 of the administrative record.  Addressing the question of whether or not the medical evidence supports Hepburn's inability to perform sedentary activity, the Sun Life nurse stated her "rationales/conclusions" as follows:

> The Medical indicates the claimant is euthyroid, managed with Levoxyl, pituitary gland is stable, with a noted decreased HGH, and that the claimant is having flares of stated insterstitial cystitis, with records in 6/09 indicating treatment with Rimso and at home intravesical heparin therapy.  Records also indicate that the claimant is seeing a psychologist for treatment of chronic pain, with a history of depression/anxiety, but with the exception of the flares of cystitis, there does not appear to be any indication of impairment secondary to pain.  Earlier medical records also indicate some memory impairment; however, more recent records on file find the claimant

---

[4]  Hepburn had seen 18 different medical providers.

13

to have a non-focal neurological exam, also noted to be alert and oriented. APS from the claimant's PCP Dr Ramsey is dated 5/15/09 and indicates the following restrictions and limitations: Occasionally lift/carry 1-20 lbs; never lift/carry greater than 20 lbs; class 3 psychiatric impairment-moderate limitations in stressful situations. Based upon the claimant's physical restrictions and limitations, it does appear that the claimant is capable of sedentary function, with intermittent flares of pain related to insterstitial cystitis that may affect function.

Sun Life's nurse noted that, as of 2007, Hepburn was coping with sleep disturbances, depression and anxiety, concentration difficulties, and mood disorders. It was noted that Hepburn was experiencing kidney and bladder problems, and that she was diagnosed with interstitial cystitis and was undergoing several bladder flushing procedures. From 2008 onward, Hepburn continued to suffer from bladder infections and incontinence and had her gallbladder removed. Sun Life's nurse also noted that Hepburn had developed kidney problems, and her GFR rate was 47% to 58%, which is indicative of chronic kidney disease. Sun Life's nurse further noted that Hepburn "was euthyroid, managed with Levoxyl" and "the pituitary gland was stable with a noted decreased HGH" and "flares of interstitial cystitis" and she had undergone "a non-focal neurologic exam." It was noted that "pain from interstitial cystitis may affect function." Sun Life's nurse demurred on the psychological impairments as, "not being within the writer's scope." She recommended a psychiatric consultant referral. Still, the nurse wrote "it does appear that claimant is capable of sedentary function."

On September 12, 2009, Calvin P. Fuhrmann, M.D., FCCP, board certified, internal medicine, conducted a medical review of Hepburn's case. Dr. Fuhrmann did not personally evaluate the claimant and based his opinions on his review of the medical records. Dr. Fuhrmann's opinion was as follows:

14

It is my considered medical opinion at the present time that the claimant's initial cause for inability to carry out her responsibility has clearly been addressed, that she is now approximately five years post-surgery, and that at the present time her current medical status indicates that she clearly would be capable of carrying out her usual sedentary responsibilities. A limiting factor is, however, that she does have intermittent attacks of severe pain in her bladder with spasm and that self-administration of medication does not always address these problems.

Dr. Fuhrmann further opined:

There is nothing from an endocrinologic, neurologic or neurosurgical point of view that would prevent the claimant from a sedentary position. The limitations and restrictions offered by her attending physician clearly fall into the area of psychiatric limitation based on the claimant's inability to sustain what he describes as stressful situations. However, there is nothing at the present time in review of the psychiatric history that would indicate that claimant has a psychiatric condition that would prevent her from carrying out her usual responsibilities.

Dr. Fuhrmann acknowledged that Hepburn's psychiatric status and psychological status were outside his area of expertise and that a more recent assessment of her psychiatric condition would be of value.

Dr. Fuhrmann supplemented his opinions with a memo dated January 11, 2010, after being provided additional medical records from the Neuroendocrine Clinic at Massachusetts General Hospital and Dr. Ramsey's office note of October 29, 2009. Dr. Fuhrmann noted that it was "apparent that the claimant has significant psychological issues," but that her "physical status is such that she should be expected to carry out her usual responsibilities." Dr. Fuhrmann again noted that a current evaluation of Hepburn's psychiatric condition would be of value.

On September 21, 2009, Bonnie Bray, MSW, LICSW, C-ASWCM conducted a "Psych Review" of the records. Bray's opinion on the question of whether or not Hepburn's depression rose

15

to a level as to be a contributory factor to her ability to function at a sedentary activity level was stated as follows:

> The records suggest that the Insured has complained of cognitive problems, with memory and concentration difficulty. However, the records do not appear to contain results of objective cognitive testing to assess actual impairment. The Insured's comprehensive and organized Medical History summary would not suggest that she is experiencing significant cognitive impairment. Stress has been identified as a contributory factor to the Insured's medical and psychological complaints. She has been given a Class 3, moderate psychiatric limitation, on the most current APS. It appears as though the Insured's depression has contributed to her medical problems and is influenced by her medical conditions. However, it does not appear as though the Insured's depression, in and of itself is significantly impacting her functioning and ability to work.

On January 5, 2010, Bray supplemented her September 21 report after having reviewed records from Elizabeth McColl, LCSW, Therapist, dated 5/7/08-9/9/09. Bray reviewed in detail McColl's notes but concluded that the records did not "contain sufficient details on severity or frequency of psychiatric symptoms or on how her psychiatric symptoms are impacting her functioning to support a severe a psychiatric condition."

An "Employability Assessment" was conducted by Sun Life's in-house employee Vocational Consultant Sandra Boyd, MS, CRC, CDMS on February 24, 2010. Boyd was asked to conduct a "transferrable skills analysis in order to identify alternative occupations . . . commensurate with Ms. Hepburn's transferrable skills, physical capacities and reasonable wage." The analysis was based on the medical file review completed by Dr. Fuhrmann on January 11, 2010. A transferrable skills analysis was done using Open Options career software, which is a current and updated computerized occupational database developed by Career Planning Specialists Software, Inc. Boyd identified three occupations which she found to meet Hepburn's physical restrictions, qualifications

16

and reasonable wage. Those identified were assignment clerk, production coordinator, and production clerk, each a sedentary occupation with a median hourly wage of $19.44/hour.

As was required by her contract, Hepburn applied for and was awarded Social Security Disability Insurance Benefits. The SSA found Hepburn to be totally and permanently disabled under its rules, as of May 27, 2004. On November 29, 2006, Sun Life received notice that Hepburn was awarded Social Security benefits; however, the administrative law judge's full decision does not appear in the administrative record and was not provided by Hepburn. The notice of decision stated that on November 2, 2006, the plaintiff was found disabled "because of a brain disorder, joint pain, fatigue, vision problems, memory loss, and mental illness so severe that you are unable to perform any work existing in significant numbers in the national economy."

On March 4, 2010, after concluding its claim review, Sun Life notified Hepburn that her LTD benefits "have been terminated effective 10/20/2009 as the medical on record does not support an inability to perform any gainful occupation at a sedentary level of activity."[5] Sun Life's letter reviewed the relevant provisions of the policy, listed the medical and summarized records reviewed, including the records review done by Sun Life's nurse consultant, its physician consultant, and its psychiatric consultant, noted the conclusion of the "Employability Assessment," and outlined Hepburn's appeal rights. Sun Life's letter also stated that Hepburn's "approval for Social Security Disability benefits was taken into consideration in making our decision," but that the medical relied on by SSA "did not include copies of your most recent records."

---

[5] Sun Life correctly frames the issue in the case as whether plaintiff was disabled from "any occupation" in 2009, not 2004. Under the policy provisions cited above, during the first 60 months of disability, the policy required that plaintiff be unable to perform the duties of her regular occupation. To be eligible for benefits beyond 60 months plaintiff had to meet a stricter standard of total disability, *i.e.*, inability to perform the duties of any occupation.

17

On July 12, 2010, Hepburn appealed Sun Life's termination of her disability benefits in a letter from her attorney . Included with the appeal letter were letters from Dr. Ramsey dated June 11, 2010; Dr. Thomas dated May 28, 2010; Dr. Cameron dated May 11, 2010; Dr. Johnson dated June 11, 2010; Dr. Colvett dated May 10, 2010; and Dr. Shahbazi dated May 25, 2010.

Sun Life responded to Hepburn's attorney on August 24, 2010, noting receipt of the doctors' letters and requesting that medical records corresponding with the letters be provided. In addition, Sun Life requested "a complete copy of the determination that was reached by the Social Security Administration (SSA) by the administrative law judge on November 2, 2006"[6] and any record reviewed by the SSA. Sun Life also notified Hepburn that it would proceed through a vendor, ErgoScience, to have a Functional Capacity Evaluation (FCE) completed "to better assess her capacity to perform sedentary occupation."

The FCE was conducted on September 14, 2010, by Apex Physical Therapy. The physical work performance evaluation determined that plaintiff "is able to tolerate the sedentary level of work for the 8-hour day/40-hour week." The report noted that "the tolerance for the 8-hour day was significantly influenced by the client's self-limiting and inconsistent behaviors and indicates her minimal rather than her maximal ability."[3] Self limiting behavior may be the result of pain, psychological issues or attempts to manipulate test results. According to the report, Hepburn self-limited on 30% of the 10 tasks, exceeding normal limits of 20% for motivated clients. The FCE included no assessment of cognitive impairments.

---

[6] As noted above, the full decision of the Social Security Administration in Hepburn's case does not appear in the administrative record. Sun Life contends that plaintiff never provided it. Hepburn does not dispute that or offer any other explanation about why it was not provided.

[3] Self-limiting behavior means the client stopped the task before a maximum effort was reached.

Sun Life also sought "peer file review" through Reliable Review Services, a company which provides reviewing physicians. The review was conducted by Marie-Claude Rigaud, M.D., M.P.H., a board certified psychiatrist, and Lyle Mitzner, M.D., a board certified endocrinologist. Dr. Rigaud found "no clear objective findings to support primary clinical depression or anxiety" and opined that "from a purely psychiatric standpoint, no restriction and/or limitations were identified as supported by the records for the period from October 10, 2009 forward." Dr. Mitzner opined that "[f]rom an endocrinologic and internal medicine perspective, my review of the records and my phone conference with Dr. Ramsey failed to find any objective data to limit or restrict the claimant for medical reasons." As noted, Dr. Mitzner spoke with Dr. Ramsey during his evaluation. Dr. Rigaud discussed the case with Dr. Jobson and Elizabeth McColl, LCSW. Neither Dr. Rigaud nor Dr. Mitzner interviewed Hepburn.

On November 2, 2010, Sun Life denied Plaintiff's appeal and upheld its prior decision to terminate benefits. Sun Life's final decision letter identified the relevant provisions of the policy and the additional information submitted with the appeal. The letter also addressed Dr. Ramsey's June 11, 2010 letter's comments on the new diagnosis of possible Guillain-Barre syndrome. Sun Life explained: "Ms. Hepburn's eligibility for benefits ended as of October 20, 2009. The information regarding the symptoms associated with Guillain-Barre syndrome do not appear to have manifested until several months later. Any restrictions and/or limitations that may have resulted from Guillain-Barre syndrome would not result in retroactive benefit eligibility."

Sun Life also addressed the issues of fatigue and depression, and the independent opinions of Drs. Mitzner and Rigaud. In particular, Sun Life noted Dr. Mitzner's discussion with Dr. Ramsey and Dr. Ramsey's failure to provide any objective data to support functional impairment. Dr.

19

Mitzner also stated that he had "not been able to find anything objective to support why the claimant would or should have poor memory or concentration from the point of view of her endocrinologic or internal medicine problems."

Similarly, Dr. Rigaud's report was noted to include discussions with Dr. Jobson, plaintiff's psychiatrist, and Ms. McColl, plaintiff's therapist. Dr. Rigaud noted that Dr. Jobson clarified that his comments on plaintiff's memory deficits were based on subjective complaints as he had not conducted any testing. Dr. Rigaud concluded that "[r]eview and analysis of the totality of the clinical/medical documentation and additional information obtained during case discussion with Dr. Jobson and Ms. McColl did not provide evidence of significantly acute symptoms or manifestations related to a mental/psychiatric condition. . . . No restrictions or limitations were identified as related to the claimant's reported depression and anxiety."

Finally, Sun Life reminded Plaintiff that she had not received continuing care for depression and that mental illness benefits were limited to a maximum of 24 months, and plaintiff had already received 60 months of benefits.

Plaintiff's administrative appeals were exhausted at this time.

## III.  Analysis

The plaintiff contends that the defendant Sun Life's decision to terminate the plaintiff Connie S. Hepburn's long-term disability benefits was arbitrary and capricious as matter of law. Sun Life contends that the administrative record contains more than enough evidence to support Sun Life's decision to terminate benefits and the undisputed facts contained in the administrative record demonstrate that Sun Life did not abuse its discretion when it denied the claim for additional long term disability benefits.

### A. Conflict of Interest

In this case, it is undisputed that the plan administrator not only pays benefits to employees, but also determines who is eligible to receive benefits. Consequently, this Court must consider this conflict of interest as one of the factors in determining whether or not the defendants' termination of the plaintiff's benefits was arbitrary and capricious. *Glenn,* 461 F.3d at 666. In addition, the Court is entitled to "factor in the plan administrator's failure to give consideration to the Social Security Administration's ("SSA") determination that [a claimant] was totally disabled." *Id.*[4]

Sun Life's termination letter dated November 2, 2010,  states that Sun Life took into consideration Plaintiff's 2006 approval for Social Security Disability benefits, but indicated that Sun Life was  aware that the medical used to make their decision did not include her most recent medical records.  Plaintiff also complains that RRS reviewer, Dr. Marie Claude Rigaud, a psychiatrist, and RRS reviewer Dr. Lyle Mitzner, an endocrinologist, were never provided the findings of the Social Security Administration in the records provided for their review.  Therefore, the plaintiff contends that because Sun Life requires a participant, like the plaintiff, to apply for Social Security benefits and proceed through all levels of appeal, the failure to provide this determination of disability to Sun Life's reviewers was arbitrary and capricious.

The Court does not find that the Sun Life's failure to provide its' reviewers with the letter approving the plaintiff for Social Security disability was arbitrary and capricious because the plaintiff failed to provide Sun Life with the full decision of the Social Security Administration as requested by Sun Life.  Therefore, this is not a case where Sun Life had the  "thorough objectively

---

[4]The insurance contract in this case required the plaintiff to apply for Social Security Disability, and after she was approved, her benefits were an offset to her insurance benefits, and therefore, the defendants also received a benefit from Social Security.

verifiable [disability] determinations" of the Social Security Administration." *Calvert v. Firstar Finance, Inc*., 409 F.3d 286, 297 (6ᵗʰ Cir. 2005).

In addition, even if that final decision had been provided, in *Whitaker v. Hartford Life and Acc. Ins. Co.,* 404 F.3d 947, 949 (6th Cir. 2005), the Sixth Circuit held that Hartford's failure to accord greater weight to Whitaker's prior grant of social security benefits did not require reversal of the trial court. Ultimately, the Sixth Circuit held that "an ERISA plan administrator *is not bound* by an SSA disability determination when reviewing a claim for benefits under an ERISA plan." *Id.* at 949 (emphasis added). The Court reasoned that SSA Benefits are measured by a set of federal criteria, but ERISA benefits are determined by an interpretation of plan terms that differ from SSA criteria. *Id.* Therefore, Sun Life's termination of plaintiff's long term disability benefits was not arbitrary and capricious simply because the plaintiff contends that Sun Life did not give proper consideration to the award of Social Security Disability Benefits. *Id.*

Plaintiff further contends that a conflict of interest has been shown by (1) excluding her Guillain-Barré diagnosis and its corresponding work restrictions; (2) choosing RRS as its medical reviewer; (3) conducting a purely physical examination for a person whose cognitive disabilities were caused by brain cancer;[5] (4) characterizing the claim as being a "denial" in its referrals when, in fact, the claim had been approved for five (5) years because of a disability; and (5) failing to reference or (perhaps excluding ) the April 20, 2010 objective MRI results which show structural changes in the brain and spinal cord. Plaintiff does not explain, however, how these facts–if true–establish a conflict of interest in this case.

---

[5] In fact, as early as 2006, a neurologist at the Mayo Clinic found no organic issues which would cause her complaints in regard to concentration and other cognitive types of problems but thought they were attributable to depression.

**B.    The Quality and Quantity of the Medical Evidence**

The plaintiff contends that Sun Life rejected all of her medical and non-medical evidence, that is, the opinions of her providers, Dr. Colvett (oncology) Dr. Ramsey (internal medicine) Dr. Jobson (psychiatry) Dr. Cameron (urology) and Dr. Thomas (neurology) and issued medical narratives that Ms. Hepburn is totally and permanently disabled and functionally limited from a physical and cognitive standpoint.   However, the Supreme Court has made clear that mandatory deference to treating physicians, while appropriate in the Social Security context, is not required in the context of ERISA benefits determinations. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 829-833, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). However, *Black & Decker* does not alter the typical arbitrary-and-capricious standard of review. The Court must still ask whether, viewing the administrative record as a whole, Sun Life has offered a reasoned explanation for its final decision.

As previously noted, when reviewing physician Dr. Mitzner contacted Dr. Ramsey, he had no "unifying diagnosis" for the plaintiff or any objective information to explain why he believed that she was disabled.   From the point of view of plaintiff's endocrinologic or internal medicine problems, Dr. Minzer was unable to find any objective evidence to support plaintiff's  poor memory or concentration. Dr. Minzer was also not able to identify a diagnosis or condition within his areas of expertise that the plaintiff has or has been diagnosed with that would result in plaintiff's restrictions or limitations.

In addition, as also previously noted, reviewing physician Dr. Riguad contacted Dr. Jobson who said his last visit with the plaintiff was on June 10, 2010 while the previous visit was in March of 2009.  Once again, Dr Jobson presented  no objective evidence to support his assessment of

plaintiff's memory deficits because Dr. Jobson had not conducted any testing to determine those deficits.

The Court finds that Sun Life's rejection of the opinions of these treating physicians because none of them offered objective data to support their opinion that the plaintiff has functional impairments suffices as reasoned explanation for the termination of plaintiff's benefits. As previously noted, her treating physician, Dr. Colvett, noted that Hepburn's "condition is complex" and she suffered from "a constellation of symptoms and health problems over the years which have defied diagnosis." This is not a case where the plan administrator had "thorough objectively verifiable determinations" of the plaintiff's treating physicians. *Calvert*, 409 F.3d at 297. As such, Sun Life's decision is this regard was not arbitrary and capricious.

Plaintiff also contends that Sun Life's vocational assessment was critically flawed basically because of the job duties described by Sun Life and her inability to perform them based upon Dr. Thomas's diagnosis of Guillian-Barre'. Plaintiff contends that Sun Life never stated that Hepburn is actually capable of performing certain skills, but rather she "has demonstrated" in the past an ability to perform certain occupational skills. These terms are taken out of context because the complete sentence reads:

Based upon this work experience, Ms. Hepburn has demonstrated the following skills and abilities:

> Planning, directing, or coordinating the work activities and resources necessary for manufacturing products in accordance with cost quality, and quantity specifications.

The vocational reviewer then concludes that the occupations of Assignment Clerk, Production Coordinator, and Production Clerk are "commensurate with Ms. Hepburn's transferable skills or

consider entry-level with no formal training required." The Court finds that this is a reasoned explanation for the conclusion that the plaintiff is capable of sedentary employment and this supports the conclusion that she is not disabled from "any occupation." The FCE conducted by Apex Physical Therapy also supports this conclusion.

Although plaintiff insists that Dr. Thomas's restrictions in his correspondence dated May 28, 2010, of no lifting, climbing, bending, or balancing should have been incorporated in the FCE conducted on September 14, 2010. There was no indication in the FCE that would indicate that these restrictions should have been imposed at that time. Rather the plaintiff's restrictions were "self-limiting and inconsistent." Consequently, the Court does not find that Sun Life's vocational assessment was critically flawed.

### C. Selective Review – "The Spangler Rule"

The plaintiff also contends that the final decision of the plan administrator is arbitrary and capricious decision-making because it was the result of a selective review of the administrative record. *Spangler v. Lockheed Martin Energy Systems*, 313 F.3d 356, 362 (6ᵗʰCir.2002). Plaintiff has identified the following alleged incidents of selective review:

### 1. Sun Life's Refusal to Consider Guillain-Barre' Diagnosis

As explained by Sun Life in its final decision, the plaintiff's eligibility for benefits ended as of October 20, 2009 and the symptoms associated with Guillain-Barre' syndrome did not appear until several months later. In fact, the administrative record in this case indicates the plaintiff was diagnosed with probable "early Guillain-Barre' syndrome" on March 24, 2010, which is more than 5 months after her eligibility for benefits ended. This Court finds that Sun Life's refusal to consider the Guillain-Barre' diagnosis was not selective review because there is a reasoned explanation for its exclusion.

## 2. Sun Life's Exclusion of the Social Security Disability Determination

As previously discussed, although the plaintiff contends that Sun Life excluded Social Security's findings from the considerations of its own in-house vocational expert, the RRS file reviews and Ergo Science, this is contention is factually erroneous. Sun Life admittedly did not include the plaintiff's Social Security award letter in the materials it furnished . However, Sun Life requested the full decision of the Social Security Administration from the plaintiff which would have contained a summary of the medical evidence that led SSA to conclude that the plaintiff was disabled. The plaintiff never provided the full decision and the award letter merely contained conclusory findings unsupported by reference to evidence in the record about the cause of her disability. This award letter contained no "thorough objectively verifiable determinations" of the Social Security Administration." *Calvert*, 409 F. 3d at 297. Therefore, there is a reasoned explanation for not furnishing the award letter to reviewers because the full decision of the Social Security Administration was never supplied by the plaintiff to Sun Life.

## V. Conclusion

Accordingly, giving the plan administrator's termination of benefits a deferential review, and taking into consideration that the plaintiff has the burden of supplying proof of continuing disability, the Court FINDS the termination of benefits in this case was not arbitrary or capricious even though there was a conflict of interest. Therefore, defendants' motion for summary judgment is **GRANTED**, [Doc. 21], plaintiff's motion for entry of judgment on the administrative record is **DENIED**, [Doc. 24], and plaintiff's complaint is **DISMISSED.**

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
